IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

PAUL ROBINSON,

                        Petitioner,                  **DECISION AND ORDER**
                                                        **No. 02-CV-0186(VEB)**

    -vs-

GARY GREENE, Superintendent, Great
Meadow Correctional Facility,

                        Respondent.
_____

## I.    Introduction

Paul Robinson ("Robinson" or "petitioner"), proceeding *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in New York State Supreme Court (Monroe County) on May 23, 1998, on three counts of attempted murder in the first degree; four counts of assault in the first degree; and one count of attempted assault in the first degree. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c)(1).

## II.    Factual Background and Procedural History

At about 11:00 p.m. on December 27, 1997, Robinson engaged in a shoot-out with three police officers who had forcibly entered his wife's apartment, at her request and with her signed consent, to remove him from the premises. Earlier that evening, Robinson and his wife had been embroiled in a domestic violence dispute, and Robinson had locked her out of the apartment. Robinson's fire wounded one police officer in the neck, and a second in the arm. The third officer, who was wearing a bullet-proof vest, was shot in the chest. All three officers survived.

Robinson was indicted on three counts of first degree attempted murder; four counts of first degree assault; and one count of attempted first degree assault for the shot fired at Officer DiFante, who was wearing a bullet-proof vest. His jury trial was conducted in Monroe County Supreme Court (Ark, J.).

At trial, the prosecution presented testimony that at about 10:00 p.m., Robinson's wife ("Mrs. Robinson"), had entered the S&T Lounge located a few buildings down the street from her apartment building on North Street. Samuel Montgomery ("Montgomery"), a security guard employed by the bar, observed that Mrs. Robinson was wearing a bathrobe and had no shoes or socks on, and appeared to be "upset" and "afraid." She told him that she wanted to call the police, T.1004,[1] stating, "My husband just beat the crap out of me," T.990. Mrs. Robinson was allowed to use the phone to call the police and wait inside the lounge for them to arrive.

However, the police did not respond immediately to the scene. After about fifteen or twenty minutes had elapsed, Montgomery stepped outside to watch for them. He observed a man, whom he later identified as Robinson, run out of Mrs. Robinson's apartment building toward the bar. Montgomery returned inside the lounge; Robinson entered moments later and immediately went after Mrs. Robinson. Montgomery stepped in between them and told Robinson that the police had been called and that he should go outside. T.1006. Robinson turned away and walked out of the bar, with Montgomery following him.

Once outside, Montgomery observed a marked patrol car at the intersection of North Street and Central Avenue. T.1007. As the police car approached the bar, Robinson ran down the street and entered Mrs. Robinson's apartment building. T.1012. Another police car appeared, and

---

[1] Citations to "T.___" refer to the trial transcript.

both stopped in front of the bar next to the curb. Two uniformed officers, Mark Dibelka

("Dibelka") and Thomas DiFante ("DiFante"), stepped out, and Montgomery directed them to

Mrs. Robinson, who was crying and appeared distraught. T.1118. t

Officers Dibelka and DiFante related that Mrs. Robinson told them that "she had been in

a fight with her husband" and that he "had slapped her, that he had pushed her around" and that

"when she left to contact the police," he "locked [her] out of the her apartment." T.1119, *see also*

T.871, 990. Mrs. Robinson also said that her two children were inside the apartment and that she

was worried about their safety because Robinson had a gun. T.1119-20. Mrs. Robinson explained

that an order of protection had been issued against her husband. T.1120.

Officer Dibelka placed Mrs. Robinson in the backseat of his patrol car and then,

accompanied by Officer DiFante, proceeded to Mrs. Robinson's apartment located on the third

floor of the apartment building into which petitioner had run minutes earlier. T.1121. The

officers knocked on the door to the apartment and called out, in "loud, clear, calm voice[s],"

T.1123, that they were the police and that they wanted to talk to him. T.1122. They received no

answer. The officers then used their night-sticks to rap on the door for about five to ten minutes;

still, there was no answer. T.1122. They continued to call out Robinson's name but received no

response. T.1123.

Thinking they might have been knocking on the wrong door, the officers went outside

and obtained confirmation from Mrs. Robinson that they had the correct apartment number.

Apparently, however, there were two doors to the apartment and the officers had only been

knocking on one. The officers returned to the hallway, knocked on both doors, and identified

themselves as police officers. T.1125. Again, there was no response from inside the apartment.

-3-

Believing that they were going to need to force their way into the apartment, the officers then called their superior, Sergeant Michael Kozak ("Kozak"), to ask for further direction. T.1125. Kozak arrived a few minutes later. After being briefed on the situation, Kozak advised Dibelka to inquire of Mrs. Robinson whether she wished the police to make a forced entry into her apartment. T.1126. Mrs. Robinson responded affirmatively and signed a consent form, along with a sworn deposition alleging that petitioner had beaten her that evening. Mrs. Robinson was "crying" and was "very distressed" that the police had not been able to get into the apartment yet. T.1128. She stated that she did want Robinson arrested. T.1128.

Officers Dibelka and DiFante, along with Sergeant Kozak, attempted to force their way into the apartment. The officers were able to partially pry open one of the doors, but there was someing heavy behind it which prevented it from opening fully. The second door to the apartment would not budge. The officers testified that they repeatedly yelled through the door opening for petitioner to come out and identified themselves as the police.

Unable to gain entry to the apartment, and having obtained no response from anyone inside, the police called the fire department for assistance. With the help of several firefighters and a hydraulic door-opening tool, the officers were able force open the second door. T.745. As the firemen stepped away from the door, the officers drew their weapons and yelled for petitioner to come out. T.747. Again, there was no response. With their guns drawn and flashlights activated, The officers then entered the apartment by way of the kitchen and then moved into the living room, both of which were empty. Officers Dibelka and DiFante then moved toward a set of double doors that appeared to lead to a bedroom. Officer Dibelka reached to open the doors, announcing, "It's the police. Come out." T.1138. When Officer Dibelka opened the door, Officer

DiFante observed Robinson standing in the bedroom about three to five feet away, pointing a shotgun at them. T.900. Officer DiFante kicked at the door and yelled, "It's the police, it's the police. Let me see your hands." T.898. As Sergeant Kozak stepped into the living room to see what was going on, petitioner yelled, "I'm going to kill you!" He then opened fire with the 9-millimeter firearm he was holding. T.1139.

All three of the police officers were struck by petitioner's bullets–Dibelka in the neck, Kozak in the arm, and DiFante in his chest, which was protected by a bullet-proof vest.[2] Kozak and Dibelka fired their weapons but did not strike petitioner, who continued to shoot at them. Robinson fired a total of eight shots before he ran out of ammunition, at which point he dropped his weapon and announced, "I quit." T.902. Officer DiFante ordered Robinson to lie down on the floor and then placed him in handcuffs. As emergency personnel attempted to place Robinson on a stretcher, Robinson acted agitated and attempted to kick one of the officers. At the hospital, in the presence of several police officers, Robinson asked, "How are the other guys, the cops?" T.1414. An investigator approached Robinson's bed and asked whether he wanted to discuss the incident, but Robinson looked down and did not respond.  After being treated for a minor cut on his chin, Robinson was released and taken to police headquarters for booking.

Robinson did not testify at trial. The proof was undisputed that Robinson shot all three of the officers and caused their injuries. Defense counsel attempted to argue that Robinson, when he fired the shots, did not realize that the individuals who had entered his apartment were police officers. Defense counsel requested that the trial court charge the jury on the defense of

---

[2]      Dibelka and Kozak later underwent emergency surgery for their injuries. DiFante was treated and released later that same evening.

justification, arguing that Robinson thought that the police officers actually were intruders staging a "home invasion," and that he reasonably believed that deadly physical force was necessary to defend himself or to terminate the burglary. The trial court denied defense counsel's request.

The jury returned a verdict convicting Robinson as charged in the indictment. He was sentenced to consecutive terms of imprisonment for an aggregate sentence of 60 years to life.

On direct appeal, the Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed the conviction. The New York Court of Appeal denied leave to appeal.

This federal habeas petition followed in which Robinson raises the following grounds for habeas relief: (1) petitioner was denied his due process right to a fair trial by the state court's admission of hearsay testimony of uncharged crimes; (2) petitioner was denied his due process right to a fair trial because the state court failed to provide defense counsel an opportunity to provide input regarding jury instructions; and (3) petitioner was denied his due process right to a fair trial by the state court's failure to instruct the jury on the defense of justification. *See* Petition ("Pet.") at 5-6 (Dkt. #1).[3] As discussed more fully below, the Court agrees with respondent that Robinson's second claim regarding the trial court's handling of the jury's request for information has been procedurally defaulted because the Appellate Division relied upon an adequate and independent state ground to dismiss it.

---

[3]      The Court (Foschio, M.J.) previously denied Robinson's application to file an amended petition (Dkt. #10) on the basis that the claims asserted in the proposed amended petition did not "relate back" for purposes of Fed. R. Civ. Proc. 15(c) and therefore were untimely under 28 U.S.C. § 2244. *See* Dkt. #13. The operative pleading in the instant case, therefore, is the original petition (Dkt. #1).

For the reasons set forth below, Robinson's application for a writ of habeas corpus is denied and the petition is dismissed.

## III.   Procedural Default

### A.   The "Adequate and Independent State Ground" Doctrine

The Supreme Court has held that federal courts shall "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground," be it substantive or procedural, that is "independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted). An adequate and independent finding of procedural default precludes federal habeas review of the federal claim, unless the habeas petitioner can show "cause" for the default and "prejudice" attributable thereto, *Murray v. Carrier*, 477 U.S. 478, 485 (1986), or demonstrate that the failure to consider the federal claim on habeas will result in a  "fundamental miscarriage of justice,'" *id.* at 495 (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)).

However, federal review is precluded under this doctrine only when the state ground is both an "independent" basis for, and "adequate" to support the decision. *See Harris v. Reed*, 489 U.S. 255, 261-62 (1989); *accord, e.g.*, *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006). For a state ground to be considered "independent," it must be "clear from the face of the opinion" that the court intended to rely on the state rule in disposing of the federal claim. *Coleman*, 501 U.S. at 735 (quotation marks omitted); *accord, e.g.*, *Messiah*, 435 F.3d at 195; *Harris*, 489 U.S. at 261-62 ("The state court must actually have relied on the procedural bar as an independent basis for its disposition of the case."). "[A] procedural bar will be deemed 'adequate' only if it is based on a rule that is 'firmly established and regularly followed' by the state in question."

*Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24

(1991)). Whether application of the procedural rule is "'firmly established and regularly

followed'" must be judged in the context of "the specific circumstances presented in the case,"

and "of the asserted state interest in applying the procedural rule in such circumstances." *Cotto v.*

*Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (quoting *Lee v. Kemna*, 534 U.S. 362, 386-87 (2002))**.**

> **B.     Petitioner's claim based on the trial court's failure to allow defense counsel
> an opportunity to provide input regarding its response to the jury's request
> for information during deliberations (Claim Two) is procedurally defaulted.**

Respondent has asserted the affirmative defense of procedural default as to Robinson's

claim regarding the trial court's response to the jury's request for further instructions during their

deliberations, arguing that the state court's reliance on a procedural rule to dismiss the claim

constitutes an adequate and independent state ground. The Appellate Division here ruled on the

claim as follows:

> Defendant contends that the court erred in responding to an oral request by the
> jury foreperson for further instructions, made in the presence of counsel and
> defendant, without first affording defense counsel the opportunity to participate in
> formulating the response.[4] By failing to object at a time when the error could have

---

[4]     New York's rule governing the trial court's manner of responding to jury requests for information is codified by New York Criminal Procedure Law ("C.P.L.") § 310.30, which provides as follows:
At any time during its deliberation, the jury may request the court for further instruction or information with respect to the law, with respect to the content or substance of any trial evidence, or with respect to any other matter pertinent to the jury's consideration of the case. Upon such a request, the court must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper. With the consent of the parties and upon the request of the jury for further instruction with respect to a statute, the court may also give to the jury copies of the text of any statute which, in its discretion, the court deems proper." C.P.L. § 310.30, as interpreted by the New York Court of Appeals, *see People v O'Rama*, 78 N.Y.2d 270 (N.Y. 1991), requires that counsel be given meaningful notice of jury inquiries. An important purpose of the statute "is to ensure that counsel has the opportunity to be heard *before* the response is given[.]" 78 N.Y.2d at 277 (emphasis in original). Similarly, as a matter of federal law, it is "well settled" that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds. *United States v. Ronder*, 639 F.2d 931, 934 (2d Cir. 1982) (citing *Rogers v. United States*, 422 U.S. 35, 39 (1975); *United*

-8-

been corrected, defendant failed to preserve that contention for our review[.]

*People v. Robinson*, 283 A.D.2d at 991 (citations omitted).

Here, in rejecting the claim, the Appellate Division's relied solely upon New York's preservation rule requiring the defense to object contemporaneously to an alleged error in order to preserve the alleged errors for appellate review; clearly, then, the state rule was an independent basis for its decision. Moreover,  the state court's decision rejecting the jury request claim as unpreserved was based on a fully adequate ground.[5] It is settled law in New York state "that traditional preservation rules are required" in a criminal prosecution where a defendant maintains on appeal that reversible error was committed by the trial court when it responded to written inquiries by the jury made during deliberations without permitting defense counsel to participate in the court's responses to the jury's inquiries. *People v DeRosario*, 81 N.Y.2d 801, 802-03 (N.Y. 1993) (citing *People v. Mezon*, 80 NY2d 155, 160-161 (N.Y. 1992)); *see also*, *e.g.*, *People v. Maxwell*, 235 A.D.2d 229, 230 (App. Div. 1st Dept. 1997) ("Defendant's claim that the trial court improperly issued supplemental jury instructions before providing him with meaningful notice is unpreserved for appellate review (*see*, *People v DeRosario*, 81 NY2d [at] 803), and we decline to review it in the interest of justice."); *People v. DePillo*, 262 A.D.2d 996, 997 (App.

---

*States v. Robinson*, 560 F.2d 507, 516 (2d Cir. 1977) (*en banc*), *cert. denied*, 435 U.S. 905 (1978)).

[5]     The Second Circuit has directed reviewing courts to determine the adequacy of the procedural bar by examine the circumstances of the case, directed by the following three factors, or "guideposts," used by the Supreme Court in *Lee v. Kemna*, 532 U.S. at 381-85: (1) whether the alleged procedural violation was actually relied on in the state court, and whether perfect compliance with the state rule would have changed the state court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner has "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Cotto*, 331 F.3d at 240 (quoting *Lee*, 534 U.S. at 381-85).

Div. 4th Dept.), *lv. denied*, 93 N.Y.2d 1044 (N.Y. 1999) (citing *People v. Starling*, 85 N.Y.2d

509, 516 (N.Y. 1995) ("Accordingly, counsel's silence at a time when any error by the court

could have been obviated by timely objection renders the claim unpreserved and unreviewable

here[.]") and cited by *People v. Robinson*, 283 A.D.2d at 991).

New York appellate courts consistently demand fairly strict compliance with the rule, as

the foregoing precedent makes clear, but Robinson's defense counsel failed to comply with the

procedural rule in circumstances where substantial compliance is routinely demanded. At the

time the foreperson asked oral questions of the trial court, defense counsel did not object or

request an opportunity to be heard before the trial court responded to the inquiry. Nor did defense

counsel object during the trial court's response to the jury inquiry. It was only afterwards, when

the jury had retired to continue its deliberations, that defense counsel moved for a mistrial on the

basis that the jury improperly asked questions without using a written note. Thus, the procedural

bar relied upon by the appellate court in this case was "firmly established and regularly

followed," and therefore constitutes an adequate state ground barring review of the merits of

Robinson's claim. *Compare with People v. DeRosario*, 81 N.Y.2d at 803 (finding that

preservation rules were satisfied where, "[a]fter the court had answered specific written inquiries

with defense counsel's participation, several oral colloquies took place between the court and the

jury, and trial counsel for appellant joined in an objection made by counsel for a codefendant").

Having found that the state has clearly and expressly stated that its judgment rested on an

adequate and independent state procedural bar, this Court is precluded from reviewing the claim

on federal habeas unless the petitioner demonstrates both cause for the procedural default and

resulting prejudice, or alternatively, that a fundamental miscarriage of justice would occur absent

federal court review.  *St. Helen v. Senkowski*, 374 F.3d 181, 184 (2d Cir. 2004) ("In the case of

procedural default . . . [federal courts] may reach the merits of the claim 'only if the defendant

can first demonstrate either cause and actual prejudice, or that he is actually innocent.'") (quoting

*Bousley v. United States*, 523 U.S. 614, 622 (1998)) (other citations omitted). Robinson has not

attempted to demonstrate cause and prejudice, and neither is apparent on the record before the

Court. Furthermore, Robinson has not come forward with new evidence that he actually innocent

and accordingly there is no basis for finding that this Court's failure to consider the claim will

result in miscarriage of justice. *See Coleman*, 501 U.S. at 748; *Murray v. Carrier*, 477 U.S. at

496.

      In any event, the claim does not provide a basis for issuance of the writ. The Court notes

that at no time did defense counsel claim that the trial court acted improperly in responding to the

jury foreman's questions. Indeed, Robinson did not challenge on appeal, when he was

represented on appeal, the correctness of the trial judge's supplemental instructions. Robinson has

never indicated what supplemental instructions his counsel should have suggested, nor how the

absence of any such instruction prejudiced him. *See Otero v. Eisenschmidt*, No. 01 Civ.2562HB

AJP, 2004 WL 2504382, at *32 (S.D.N.Y. Nov. 8, 2004) (rejecting habeas petitioner's claim that

trial counsel was ineffective in failing to object to trial judge's supplemental jury instructions

where petitioner never challenged the correctness of the judge's supplemental instructions, and

neither he nor his subsequent counsel suggested any supplemental instruction that trial counsel

should have requested or how the absence of any such instruction prejudiced petitioner).

## IV.   Standard of Review Applicable to Habeas Petitions

      Robinson's petition post-dates the enactment of the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, which revised 28 U.S.C. §

2254 and requires federal courts to review petitions for habeas corpus by a prisoner in state

custody in accordance with a more deferential standard codified at 28 U.S.C. § 2254(d). Under

AEDPA a writ of habeas corpus may not issue "with respect to any claim that was adjudicated on

the merits in State court proceedings unless the adjudication . . . resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is

contrary to clearly established Federal law if it "contradicts the governing law" or "if the state

court confronts a set of facts that are materially indistinguishable from a decision of [the

Supreme Court] and nevertheless arrives at a result different from" that reached by the Supreme

Court. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An unreasonable application of Federal

law is more than an incorrect application, but the petitioner need not show that all reasonable

jurists would agree that a State court determination is incorrect in order for it to be unreasonable.

*Id.* at 409-12. Instead, a Federal court should review a State court's interpretation of Federal law

using a standard of objective reasonableness. *Id.* at 409. The "increment of incorrectness beyond

error . . . need not be great; otherwise, habeas relief would be limited to state court decisions so

far off the mark as to suggest judicial incompetence." *Yung v. Walker*, 341 F.3d 104, 109-10 (2d

Cir. 2003) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation

marks omitted)).

      Claims that were adjudicated on the merits in state court proceedings will be given

AEDPA deference on federal habeas review. 28 U.S.C. § 2254(d). A state court has adjudicated a

claim on the merits when "it disposes of the claim and reduces its disposition to [a] judgment"

that either "fairly appear[s] to rest primarily on federal law or to be interwoven with federal law"

and does not rest on "a clear and express statement of reliance on a state procedural bar." *See*

*Jimenez v. Walker*, 458 F.3d 130, 145-46 (2d Cir. 2006). There is no dispute that the state

appellate court reviewed, and disposed of on the merits, petitioner's claims regarding (1) the

failure to give a jury instruction on the defense of justification and (2) the trial court's admission

of hearsay evidence. Nevertheless, since each of the petitioner's claims fails under the less

deferential pre-AEDPA standard, there is no need to conduct the AEDPA's "more intricate

analysis." *Texidor v. Artus*, 2007 WL 1982271, *5 (S.D.N.Y. July 10, 2007) (citing *Kruelski v.*

*Connecticut Superior Court for the Judicial District of Danbury*, 316 F.3d 103, 106 (2d Cir.

2003) (suggesting, in post-AEDPA cases, that habeas courts assess first whether state court's

ruling was erroneous under "correct interpretation" of the federal law at issue, then whether the

ruling was unreasonable).

## V.      Merits of the Petition

### A.      The trial court erred in failing to instruct the jury on the defense of justification. (Claim Three)

The law is well settled that "'it is not the province of a federal habeas court to reexamine

state-court determinations of state-law questions. In conducting habeas review, a federal court is

limited to deciding whether a conviction violated the Constitution, laws, or treaties of the

United States.'" *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) (quoting *Estelle v. McGuire*,

502 U.S. 62, 67-68 (1991)). Where a defendant alleges error in a state court's jury instruction, he

must establish "not merely that the instruction is undesirable, erroneous, or even 'universally

condemned,' but that it violated some right which was guaranteed to the defendant by the

Fourteenth Amendment." *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)). Thus, while a federal court may not grant habeas relief for a mere error of state law, a finding that the petitioner was erroneously deprived of a jury instruction to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights. *Davis v. Strack*, 270 F.3d at 124 (stating that in order to grant a petitioner relief for the state court's failure to grant a justification charge, the federal habeas court must resolve the following three questions in petitioner's favor: First, was he entitled to a justification charge? Second, if so, did the failure to give such an instruction result in a denial of due process? Third, if so, did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law?); *accord Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 2005).

Based on the proof presented at Robinson's trial, he was not entitled to a justification charge as a matter of New York state law. New York's self-defense statute is set forth in Penal Law § 35.15.[6] Under New York law, a justification charge is warranted, "'if on any reasonable

---

[6]     Penal Law § 35.15 provides that a person is justified in using physical force in self-defense under the following circumstances:

1. A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he . . . reasonably believes such to be necessary to defend himself . . . or a third person from what he . . . reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless:

(a) The latter's conduct was provoked by the actor himself with intent to cause physical injury to another person; or
(b) The actor was the initial aggressor; except that in such case the use of physical force is nevertheless justifiable if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force. . . .
2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:
(a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he . . . knows that with complete personal safety, to oneself and others he . . . may avoid the necessity of so doing by retreating. . . .

view of the evidence, the fact finder might have decided that defendant's actions were justified.'" *Jackson v. Edwards*, 404 F.3d at 622 (quoting *People v. Padgett*, 60 N.Y.2d 142, 145 (N.Y. 1983)). When the trial evidence, viewed in the light most favorable to the accused, sufficiently supports a justification defense, the trial court "should instruct the jury as to the defense, and must when so requested.*" People v. Watts*, 57 N.Y.2d 299, 301 (N.Y. 1982). When "no reasonable view of the evidence" would support a finding of the proposed defense, however, the trial court is not obligated to submit it to the jury. *People v. Watts*, 57 N.Y.2d at 30.

In *Matter of Y.K.*, 87 N.Y.2d 430 (N.Y. 1996), the New York Court of Appeals explained that Penal Law § 35.15 contains both an objective and subjective component: whether defendant subjectively believed deadly physical force was necessary; second, whether this belief was objectively reasonable.[7] *Matter of Y.K.*, 87 N.Y.2d at 433-34 (citing *People v. Goetz,* 68 N.Y.2d 96, 115 (N.Y. 1986)); *accord*, *e.g.*, *Jackson v. Edwards*, 404 F.3d at 623 ("The leading New York cases construing the justification defense establish a subjective and an objective component: The fact-finder must determine that the defendant believed deadly physical force was necessary and that a reasonable person would have believed the use of deadly physical force was necessary under the same circumstances. . . .") (citations omitted). Under New York law,

---

N.Y. Penal Law § 35.15. The term "deadly physical force" is defined as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." Penal Law § 10.00(11).

[7] In *People v. Goetz*, the New York Court of Appeals "explained that the justification statute imposes a two-part test which involves both subjective and objective components. When a defendant claims the use of force was justified, the fact finder must first determine if defendant believed physical force (or deadly physical force) was necessary to defend against the imminent use of physical force (or deadly physical force). That is the subjective component. If the People fail to disprove defendant believed physical force was necessary, the fact finder must next consider whether defendant's belief was reasonable, that is, whether a reasonable person would have held that belief under the circumstances which existed. It is not enough that the defendant believed that the use of force was necessary under the circumstances; his reactions must be those of a reasonable person similarly confronted. That is the objective component." *Matter of Y.K.*, 87 N.Y.2d at 433-34 (citing *People v. Goetz*, 68 N.Y.2d at 115).

reasonableness is determined based on the circumstances facing the defendant. *See People v. Goetz,* 68 N.Y.2d at 115.

Robinson's defense counsel requested that the trial court charge the jury on the defense of justification under Penal Law § 35.15 (regular self-defense) and Penal Law § 35.25 (defense of premises during the course of a burglary or attempted burglary), and submitted proposed charges. T.1533-41. Trial counsel argued that "inference . . . to be drawn," *e.g.,* T.1536, from the evidence, viewed in a light most favorable to defendant, was that Robinson, in his intoxicated state, did not hear the police officers yelling to announce their presence outside the apartment or their efforts to gain entry to the apartment, and instead thought there were "intruders" in the apartment. *E.g.,* T.1536, 1541. The prosecution opposed the request, noting that there had been no testimony that petitioner believed that he was a victim of a home invasion or that he was acting in self-defense; he did not mention anything about self-defense to the police after the shooting, and he did not take the stand at trial. *See* T.1542-45. The trial court ruled that at the present time, it was denying the request to charge justification as there was "no evidence indicating [Robinson's] state of mind and what the beliefs, whether reasonable or not . . . of the defendant were." T.1545. The trial court held that if Robinson "knew they were police his actions were clearly unreasonable under any reading of the facts[,]" and "if he didn't know they were police, just to blindly . . . shoot through a door is an unreasonable reaction, so any reading of the evidence wouldn't be a reasonable act [sic]." T.1545; *see also* T.1546.

On direct appeal, the Appellate Division held that the trial court properly denied defendant's request to instruct the jury on the defense of justification:

"Even when the evidence is viewed in [the] light most favorable to the defendant,

as is required whenever a claim is made that the trial court should have instructed the jury on the defense of justification . . . , it is clear that the jury would be engaging in sheer speculation if it were asked to draw the inference that the defendant was acting . . . in self defense" because he believed he was the victim of a "home invasion" robbery[.]

*People v. Robinson*, 283 A.D.2d at 991 (quoting *People v. Johnson*, 123 A.D.2d 330 (App. Div. 2d Dept. 1986) (alterations in original).

The Appellate Division did not err in concluding, as a matter of state law, that Robinson was not entitled to a defense of justification since no reasonable view of the evidence established the basic elements of the defense. *People v. Watts*, 57 N.Y.2d at 301; *People v. Collice*, 41 N.Y.2d 906, 907 (N.Y. 1977); *People v. Frazier*, 86 A.D.2d 557, 558 (App. Div. 1st Dept. 1982), *People v. Alston*, 104 A.D.2d 653, 654 (App. Div. 2d Dept. 1984). Although the defendant is entitled to the most favorable view of the evidence, that does not mean that the jury may resort to "'sheer speculation'"–"as if, with scissors and paste, it might construct a wholly artificial line of testimony" through the "sorting of the testimony of a single witness[.]" *People v. Alston*, 104 A.D.2d at 654 (citing, *e.g.*, *People v. Scarborough*, 49 N.Y.2d 364, 373, 374 (N.Y. 1980)). There must be at least "some evidence to support the defense theory[,]" *People v. Alston*, 104 A.D.2d at 654.

At Robinson's trial, there simply was no evidence admitted that even tended to support a finding that Robinson subjectively believed that he was the victim of a "home invasion" or that he was acting in self-defense. Robinson made no statements to anyone either before or after the incident in which he mentioned "home invasion" or assert that he had been acting in self-defense during the incident.  It simply inconceivable that Robinson was unaware that he was shooting at

police officers at the time he opened fire, and instead believed that he was facing intruders. When Robinson came after his wife at the bar, the security guard told him that his wife had just called the police and that he should wait outside. When Robinson then left the bar, a marked police car was in plain view at the intersection in front of the bar. The security guard observed Robinson immediately run back inside the apartment building; minutes later the police arrived and attempted to gain entry to the apartment, first by knocking and loudly announcing their presence. The officers yelled into the apartment through the partially opened door, and they identified themselves again when the second door eventually was forced open. These attempts to gain entry continued for about forty-five minutes. Finally, when they opened the door behind which Robinson was located, Officer DiFante yelled, "It's the police. Let me see your hands." Given the circumstances  surrounding the incident, there was no evidence from which a rational jury could infer that Robinson had an objectively reasonable belief that he needed to use deadly force to defend himself.

In this case the jury could have found in favor of Robinson based on the defense of justification only by drawing unwarranted inferences from the evidence and engaging in sheer speculation. The Court agrees with the state trial and appellate courts that the justification defense was not merely inconsistent with the evidence presented. Rather, such a defense would have required the jury to speculate as to a sequence of events unsupported by any direct evidence, to disregard materially undisputed evidence, and to draw tenuous inferences. There was no evidence to show that Robinson reasonably believed it was necessary to use deadly physical force to defend himself from deadly physical force, and thus Robinson has not shown that his case warranted a justification charge. *See Davis v. Strack*, 270 F.3d at 125-26; N.Y. Penal Law §

35.15. In any event, even under such a speculative version of the facts, Robinson still would not have been justified in using deadly physical force since he clearly had an opportunity to retreat but did not do so. Moreover, as the door opened, Officer DiFante again yelled that they were the police and told Robinson to show his hands. When Officer DiFante kicked open the door to the bedroom, it is true that the police officers had their weapons drawn, but Robinson opened fire first, and Robinson, according to Officer Dibelka, yelled, "I'm going to kill you." Robinson continued firing his weapon until he ran out of ammunition. In contrast to the serious injuries sustained by all three officers, Robinson sustained only a minor cut on his chin. *See People v. Alston*, 104 A.D.2d at 654 ("Thus, the defendant's failure to retreat, when he was able to do so, and the firing of three shots, negate essential elements of the defense[.]") (citing N.Y. Penal Law §35.15(2)(a); *People v. Collice*, 41 NY2d at 907)).

### B.     The trial court erroneously admitted hearsay testimony by petitioner's wife concerning petitioner's uncharged criminal conduct toward her. (Claim One)

Robinson asserts that it was error to allow Montgomery, the security guard, and Officers Dibelka and DiFante to testify that Mrs. Robinson told them that her husband had beaten her. *See* T.871-73, 990-94, 1003-4, 1119.  Sergeant Kozak also was permitted to testify that officers Dibelka and DiFante informed him, when he arrived on the scene, that Mrs. Robinson said that her husband had beaten her and locked her out of the apartment. T.1209. At trial, defense counsel objected to this testimony on hearsay grounds. *E.g.*, T.990-1003. The trial court agreed with the prosecutor that the testimony of Officers Dibelka, DiFante, and Kozak regarding what Mrs. Robinson said to them about her husband's actions was not offered to prove the truth of the matter asserted therein (*i.e.*, that her husband had beaten her and locked her out), but instead to

explain the police officers' actions in pursuing a forced entry into Mrs. Robinson's apartment.

T.873, 1209. The trial court further determined that Montgomery's testimony that Mrs.

Robinson, upon entering the bar the first time, announced that her husband had "just beat the

crap out of her" was admissible as under the "excited utterance" exception to the rule against

hearsay. T.1001. The trial court gave several limiting instructions to the jury with respect to all of

the above-referenced testimony. T.873, 1119, 1717. On direct appeal, the Appellate Division

held that the trial court

> properly determined that the testimony of the security guard concerning the
> statements made to him by defendant's wife were admissible under the excited
> utterance exception to the hearsay rule. "[T]he decisive factor is whether the
> surrounding circumstances reasonably justify the conclusion that the remarks were
> not made under the impetus of studied reflection". Under the circumstances
> presented here, we conclude that the statements of defendant's wife to the security
> guard were not made under the impetus of studied reflection. Contrary to
> defendant's further contention, the court properly permitted the police officers to
> testify with respect to statements made to them by defendant's wife. Although
> those statements concerned uncharged crimes committed by defendant, the
> testimony of the officers with respect to those statements "was admissible as
> background material that completed the narrative of the episode", and the court
> properly instructed the jury that the testimony was admitted for that limited
> purpose.

*People v. Robinson*, 283 A.D.2d at 991 (internal quotations and citations omitted).

 "Federal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire*,

502 U.S. at 67 (quoting *Lewis v. Jeffery*, 497 U.S. 764, 780 (1990)). "[E]rroneous evidentiary

rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance

of a writ of habeas corpus. Rather, the writ would issue only where [the] petitioner can show that

the error deprived [him] of a fundamentally fair trial." *Rosario v. Kuhlman*, 839 F.2d 918, 925

(2d Cir. 1988) (quoting *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.), *cert. denied*, 464 U.S. 1000

(1983)) (emphasis in original)); *see also Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir.) (*per curiam*), *cert. denied*, 543 U.S. 879 (2004). Stated another way, a petitioner seeking to prove that a constitutional violation occurred through the state trial court's erroneous admission of evidence must establish that "the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985). The erroneously admitted or withheld evidence "must have been 'crucial, critical, highly significant.'" *Id.* (quoting *Nettles v. Wainwright*, 677 F.2d 410, 414-15 (5th Cir. 1982)).

The Court turns first to whether the state courts erred as a matter of state evidentiary law in admitting Robinson's wife's statements to the security guard that her husband had beaten her. In making that determination, the trial court "must ascertain whether, at the time the utterance was made, the declarant was under the stress of excitement caused by an external event sufficient to still his reflective faculties, thereby preventing opportunity for deliberation which might lead the declarant to be untruthful[,]" and "must assess not only the nature of the startling event and the amount of time which has elapsed between the occurrence and the statement, but also the activities of the declarant in the interim to ascertain if there was significant opportunity to deviate from the truth." *People v. Edwards*, 47 N.Y.2d 493, 497 (N.Y. 1979). The "decisive factor" for determining admissibility is "whether the surrounding circumstances reasonably justify the conclusion that the remarks were not made under the impetus of studied reflection[.]" *Id.* In other words, " '[a]n excited utterance occurs under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been

brought fully to bear by reasoned reflection'–a period which 'is not measured in minutes or

seconds but rather is measured by facts.'" *Mungo v. Duncan*, 393 F.3d 327, 331 (2d Cir. 2004)

(quoting *People v. Cotto*, 92 N.Y.2d 68, 78-79 (N.Y. 1998)). The Appellate Division, in

affirming Robinson's conviction, concluded that under the circumstances presented, the remarks

"were not made under the impetus of studied reflection[.]" *People v. Robinson*, 283 A.D.2d at

991 (quoting *People v. Edwards*, 47 N.Y.2d at 497).

      In the present case, Montgomery the security guard testified that when he first saw Mrs.

Robinson, "what got [his] attention" was that "she was barefooted" and wearing a nightgown

even though it was "snowing and cold" outside. T.1000-01. Montgomery said that Mrs. Robinson

"[s]eemed to be very afraid, frightened." T.1000. She was "[f]avoring her neck and in pain."

T.1000. He asked her if he could help her, and that is when she stated that her "husband just beat

the hell out of her and she needed to call the police." T.993. The Court notes that the main reason

as to why the defense argued against the admissibility of Montgomery's testimony was that the

prosecutor failed to lay a foundation regarding how long it had been since Mrs. Robinson

allegedly had been assaulted by her husband. *See* Pet'r App. Br. at 4-5, Resp't Ex. C at 11-12.

However, the New York Court of Appeals explicitly declined to adopt a rule imposing "some

arbitrary limitation on the permissible period between the event and the excited utterance,"

because to do so "would run counter to the assumptions underlying the admissibility of excited

utterances and would contravene [its] recent decisions which have departed from the rigid res

gestae analysis, with its requirement of contemporaneity, in favor of admitting excited utterances,

as exceptions to the hearsay rule, on the basis of their inherent trustworthiness[.]" *People v.*

*Brown*, 70 N.Y.2d 513, 520-21 (N.Y. 1987) (holding that statements made by dying victim, 30

minutes after having been shot, in response to questions by police officer were admissible under

excited utterances exception to hearsay rule). Based on the testimony presented at trial, the Court

cannot say that the state trial and appellate courts were incorrect in concluding that Mrs.

Robinson had been exposed to an "upsetting event" that was "sufficiently powerful" to "render

[her] normal reflective processes inoperative," *People v. Vasquez*, 88 N.Y.2d 561, 574 (N.Y.

1996), and therefore her statements to the security guard at the bar fell within New York's

"excited utterance" exception to the hearsay rule.

The Court turns next to the testimony of Officers Dibelka, Officer DiFante, and Sergeant

Kozak, admitted pursuant to New York's rule allowing hearsay evidence of a defendant's

uncharged crimes to be admitted "as necessary background material and to complete the narrative

of events." *People v. Harding*, 228 A.D.2d 183 (App. Div. 1st Dept. 1996); *see also People v.

Jimenez*, 246 A.D.2d 333 (App. Div. 1st Dept. 1998). New York state courts routinely allow such

evidence of uncharged criminal conduct for this purpose. *E.g.*, *People v. Till*, 87 N.Y.2d 835,

836-37 (1995) (internal citations omitted) (evidence of uncharged crimes is admissible to provide

necessary background information or to complete a narrative of events); *People v. Porter*, 256

A.D.2d 363, 363 (App. Div. 2d Dept. 1998) (admitting evidence of prior bad acts where they

helped to establish motive and to complete the narrative of events); *see also Moses v. Senkowski*,

No. 01 CV 4423(SJ), 2004 WL 1242511, *10 (E.D.N.Y. May 28, 2004) ("Even if the prior

shootings had been connected in some way with the petitioner, they could have been admissible

under New York law, which allows testimony concerning a defendant's uncharged bad acts

where that testimony is necessary to complete the witness's narrative of events.") (citations

omitted). Thus, the Court finds that the state trial and appellate courts properly concluded that

testimony offered by the police officers regarding statements made to them by Mrs. Robinson were not offered for a hearsay purpose, as a matter of New York state law.

The Court's admissibility analysis with regard to both the security guard's and the three police officers' testimony cannot end there, however. Although the hearsay declarant, Mrs. Robinson, had been subpoenaed for trial, the prosecutor chose not to call her to testify. T.1557.[8] Therefore, the admission of her statements poses an issue under the Confrontation Clause of the Sixth Amendment. The state courts in Robinson's case did not analyze this issue under the rubric of Confrontation Clause jurisprudence, however.

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." In *Ohio v. Roberts*, the Supreme Court developed a two-part test for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause. *Idaho v. Wright*, 497 U.S. 805, 814 (1990) (citing *Ohio v. Roberts*, 448 U.S. 56, 65 (1980)); *see also White v. Illinois*; *accord, e.g.*, *People v. James*, 93 N.Y.2d 620, 641 (N.Y. 1999). First, the prosecution must demonstrate that the declarant is unavailable to testify. Second, the statement must bear adequate indicia of reliability. *See Idaho v. Wright*, 497 U.S. at 815. "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a

---

[8]     In the context of oral argument concerning defense counsel's request for a missing witness charge with regard to Mrs. Robinson, the prosecutor disputed that she was under the control of the state. He observed that Mrs. Robinson had been interviewed by defense counsel before trial and had given tape-recorded statements. T.1556-57. The prosecutor also noted that Mrs. Robinson had called both defense counsel's and his office repeatedly, and had sat behind petitioner in the courtroom for three days at a time when she could have testified for the defense.

showing of particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. at 66 (holding that the testimony of a witness at a preliminary hearing, where the witness had been subject to cross-examination, could be admitted into evidence at trial where that witness had failed to honor several subpoenas to appear); *accord, e.g.*, *People v. Kello*, 96 N.Y.2d 740 (N.Y. 2001).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court abandoned twenty-five years of precedent and "abrogate[d] *Roberts* with respect to prior *testimonial* statements by holding that such statements may never be introduced against the defendant unless he or she had an opportunity to cross-examine the declarant, regardless of whether that statement falls within a firmly rooted hearsay exception or has particularized guarantees of trustworthiness." *United States v. Saget,* 377 F.3d 223, 228 (2d Cir. 2004) (citing *Crawford*, 541 U.S. at 68) (emphasis supplied)). *Crawford* conditioned its bar on the admission of prior out-of-court statements that were not subject to cross-examination on whether the statements are "testimonial" in nature; this limitation stems from *Crawford*'s definition of a witness, as that term is used in the Confrontation Clause, as someone who "bear [s] testimony." *Crawford*, 541 U.S. at 51(internal quotation marks omitted). *Saget,* 377 F.3d at 228. The Supreme Court expressly declined to "spell out a comprehensive definition of 'testimonial,'" *Crawford*, 541 U.S. at 68, it provided examples of those statements at the "core" of the definition; these include prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations. *See id.* at 51, 68; *accord Saget*, 377 F.3d at 228. With respect to the last example, the Supreme Court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an

acquaintance does not." 541 U.S. at 51. As the Second Circuit has observed, the types of statements cited by the *Crawford* court as "testimonial" share certain characteristics–"they all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." *Saget*, 377 F.3d at 228 (citing *Crawford*, 541 U.S. at 53 n. 4 (stating that declarant's "recorded statement, knowingly given in response to structured police questioning," was made in an interrogation setting and was therefore testimonial)).  On the other hand, where the statement is "nontestimonial" in nature, it appears that under *Crawford* that the Confrontation Clause is ordinarily not implicated. Rather, in such a case the statement's admissibility is merely a matter of applying evidentiary rules regarding hearsay and various hearsay exceptions. *See Crawford*, 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in the development of hearsay law–as does Roberts, and as would an approach that exempted such statements from Confrontational Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination.").  Thus, under *Crawford*, Sixth Amendment Confrontation Clause analysis will usually turn on the question whether a particular statement is testimonial in nature or not. *Saget*, 377 U.S. at 228.

The Supreme Court recently revisited its holding in *Crawford* in *Davis v. Washington*, 547 U.S. __, 126 S. Ct. 2266 (2006), partially answering the question expressly left unanswered by *Crawford*, namely, what types of hearsay qualify as admissible "nontestimonial hearsay." *Crawford*, 541 U.S. at 68. In *Davis*, a 911 emergency operator answered an emergency 911

telephone call from the victim who stated that she was involved in a domestic dispute with the defendant who had been beating her. At defendant Davis' trial, the court admitted the recording of the non-testifying victim's conversation with the 911 operator; defendant appealed, claiming a violation of his Sixth Amendment Confrontation Clause rights. The Supreme Court reiterated in *Davis* that the Confrontation Clause bars the admission of "testimonial" statements of a non-testifying declarant unless the declarant is unavailable and defendant had a prior opportunity to cross-examine him or her, *Davis*, 547 U.S. at__, 126 S. Ct. at 2273, and that a declarant is a "witness" within the meaning of the Confrontation Clause only where witness' out-of-court statements are "testimonial" in nature, *id.* The Supreme Court stated that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 2273. On the other hand, statements are "testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 2273-2274. Given the circumstances under which the police 911 operator questioned the victim in *Davis*, the Supreme Court determined that the victim's statements were elicited to meet a present emergency. Therefore, they were nontestimonial and admissible under *Crawford*.

Although *Crawford* and *Davis* leave the status of the *Roberts* line of cases "somewhat less clear" insofar as those decisions deal with statements that are "nontestimonial" in nature, the Second Circuit has observed that the *Crawford* court expressly declined to overrule *White v. Illinois,* 502 U.S. 346 (1992) , in which the majority of the Supreme Court considered and

rejected a conception of the Confrontation Clause that would restrict the admission of testimonial statements but place no constitutional limits on the admission of out-of-court nontestimonial statements. *See Crawford*, 541 U.S. at ___, 124 S. Ct. at 1370 ("Although our analysis in this case casts doubt on that holding, we need not definitively resolve whether [*White v. Illinois*] survives our decision today . . . ."); *see also Saget*, 377 F.3d at 228; *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006). "The Supreme Court, however, in *Davis* made clear that the right to confrontation only extends to testimonial statements, or, put differently, the Confrontation Clause simply has no application to nontestimonial statements." *Feliz*, 467 F.3d at 231 (citing *Davis v. Washington*, __ U.S.___, 126 S. Ct. at 2274 (holding that the limitation with respect to testimonial hearsay is "so clearly reflected in the text" of the Confrontation Clause that it "must . . . mark out not merely its 'core,' but its perimeter")).

The Court does not believe that it needs to decide whether the Mrs. Robinson's out-of-court hearsay statements to the security guard and the police officers were "testimonial" or "nontestimonial" in nature for purposes of *Crawford* in order to resolve this petition.[9] Even if the Court were to find that the statements were "testimonial" and violated *Crawford*'s *per se* bar on

---

[9]     Because the Court determines that any Confrontation Clause error was harmless under any standard, it need not address the issue of *Crawford*'s retroactive application, which arises since Robinson's trial and appeal were concluded in 2001, well before *Crawford v. Washington* was decided in 2004. The Second Circuit, in *Mungo v. Duncan*, held that *Crawford* should not be applied retroactively on collateral review. 393 F.3d 327, 334-36 (2d Cir. 2004) (analyzing the *Crawford* rule under *Teague v. Lane,*489 U.S. 288, 310 (1989) (plurality opn.)*,* and concluding that the rule did not qualify as a "watershed rule" of criminal procedure coming within the exception to *Teague v. Lane*'s non-retroactivity doctrine) (citing *Teague*, 489 U.S. at 310; *Penry v. Lynaugh*, 492 U.S. 302, 313 (1989) (majority opn.) (adopting the *Teague* analysis)). Recently, in *DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006), the Second Circuit appeared to retreat from *Mungo*, noting that the "relevant standards governing the Sixth Amendment's Confrontation Clause are currently in considerable flux." 461 F.3d at 198 (comparing *Mungo v. Duncan*, 393 F.3d at 333-34 (declining to apply *Crawford* retroactively to habeas petitioners challenging state court convictions) *with Whorton v. Bockting*, __U.S. __, 126 S. Ct. 2017 (2006) (granting petition for writ of *certiorari* to review a Ninth Circuit decision, *Bockting v. Bayer*, 399 F.3d 1010 (9th Cir. 2005), which held that *Crawford* does apply retroactively on collateral review)).

such statements where that opponent has not had an opportunity to cross-examine the declarant,

the Confrontation Clause error would be subject to harmless error review. *See United States v.*

*Lombardrozzi*, __ F.3d __, No. 04-0380-cr, 2007 WL 1989255, at *11-12 (2d Cir. July 11, 2007)

("The government concedes that in light of the Supreme Court's decision in *Crawford*, the

district court erred in admitting Isoldi's plea allocution, and that Lombardozzi properly preserved

for appellate review the question of whether the plea allocution was admitted in violation of the

Confrontation Clause. The district court's admission of the plea allocution is thus subject to

harmless error review.") (citing *United States v. McClain*, 377 F.3d 219, 222 (2d Cir.2004)

(noting that "[i]t is well established that violations of the Confrontation Clause, if preserved for

appellate review, are subject to harmless error review . . . and *Crawford* does not suggest

otherwise")). As discussed more fully below in this opinion in this Court's analysis of the

hearsay statements' admissibility under *Roberts*, the Court concludes that any Confrontation

Clause error in admitting the out-of-court statements by Mrs. Robinson was harmless under any

harmless error standard articulated by the Supreme Court.

Regardless of whether the prosecution could satisfy the second part of the *Ohio v. Roberts*

test by showing that the hearsay evidence fell within "a firmly rooted hearsay exception" or had

other "particularized guarantees of trustworthiness," the prosecution could not satisfy the first

part because it failed demonstrate the declarant's unavailability to testify. *See People v.*

*Rodriguez*, 306 A.D.2d 686, 689 (App. Div. 3d Dept. 2003) (holding that admission of the 911

tape recording call placed by victim's son during defendant's attack on the victim at her home

violated defendant's constitutional rights of confrontation; although the 911 call qualified as an

excited utterance exception to the hearsay rule, the prosecution did not call the son to testify and

therefore failed to demonstrate his unavailability to testify) (citing U.S. Const., 6th Amend.; N.Y.

Const., art. I, § 6)); *see also United States v. Myton*, No. 05-5416-CR, 224 Fed. Appx. 125, 2007

WL 1492470, at *2 (2d Cir. 2007) (unpublished opn.) ("Because the government failed to proffer

sufficient evidence at trial to demonstrate adequately Campbell's unavailability, however, his

statements were erroneously admitted under *Roberts*.").

   This Confrontation Clause error is subject to harmless error analysis. *See United States v.*

*Vitale*, 459 F.3d 190, 195 (2d Cir. 2006) (citing *United States v. McClain*, 377 F.3d 219, 222 (2d

Cir. 2004) ("It is well established that violations of the Confrontation Clause, if preserved for

appellate review, are subject to harmless error review . . . . ") (citing *Coy v. Iowa*, 487 U.S. 1012,

1021 (1988) (holding that denial of face-to-face confrontation is subject to harmless error

review); *United States v. Tropeano*, 252 F.3d 653, 659 (2d Cir. 2001) ("[H]armless error analysis

applies to evidentiary errors and to violations of the Confrontation Clause.")).  On federal habeas

review of a state court criminal conviction, the applicable harmless-error standard is found in

*Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Fry v. Pliler*, __ U.S. __, 127 S. Ct. 2321, 2328

(2007) (holding that in 28 U.S.C. §2254 proceedings, a federal court must assess the prejudicial

impact of constitutional error in a state-court criminal trial under *Brecht*'s "substantial and

injurious effect" standard, whether or not the state appellate court recognized the error and

reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth

in *Chapman  v. California*, 386 U. S. 18, 24 (1967)). "The Supreme Court clarified in *Brecht v.*

*Abrahamson*, 507 U.S. [at 637], that a habeas corpus petition should not be granted unless the

violation of constitutional rights had 'substantial and injurious effect or influence in determining

the jury's verdict.'" *Mingo v. Artuz*, 174 F.3d 73, 78 (2d Cir. 1999) (quoting *Brecht*, 507 U.S. at

637) (internal quotation marks and citation omitted in original)). In other words, a habeas

petitioner must demonstrate that the constitutional error at his trial resulted in "actual prejudice."

*Brecht*, 507 U.S. at 637; *accord, e.g.*, *Dallio v. Spitzer*, 343 F.3d 553, 569 (2d Cir. 2003).

In assessing likely impact of a Confrontation Clause error on the jury, "the Supreme

Court has found the following factors to be relevant . . . (1) the overall strength of the

prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted

evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence

was cumulative of other properly admitted evidence." *Zappulla v. New York*, 391 F.3d 462, 468

(2d Cir. 2004). The strength of the prosecution's case, however, "is probably the single most

critical factor." *United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006) (internal quotation marks

omitted) (quoted in *Lombardozzi*, 2007 WL 1989255, at *10); *see also Samuels v. Mann*, 13 F.3d

521, 526-27 (2d Cir. 1993). The top three counts of the indictment charged Robinson with

attempted murder in the first degree (murder of a police officer). The hearsay evidence at issue

was that Robinson had been involved with a domestic violence dispute with his wife earlier on

the night of the shooting. The evidence, which did not bear upon an ultimate factual issue before

the jury for resolution, therefore was not very important. Furthermore, the prosecutor only made

limited reference to the evidence and did not repeat the substance of the hearsay in his

summation, merely noting that Mrs. Robinson "describe[d] an incident" to the police, that she

had an order of protection against Robinson, who had a gun, and that she was worried about her

two children inside the apartment. T.1639. The prosecutor stated that "the information was

provided for a limited purpose, not for the truthfulness of it, but to explain what they did."

T.1637. *See Lombardozzi*, 2007 WL 1989255, *12 ("Because the government's properly

-31-

admitted evidence as to Count 9 is "overwhelming," and the reference it made in summation to

the allocution was limited, we hold the admission of Isoldi's plea allocution was harmless error,

and we affirm Lombardozzi's conviction on Count 9.") (citing *Reifler*, 446 F.3d at 90 (admission

of plea allocutions that bore on two essential elements of a conspiracy charge was harmless error

given, *inter alia*, "the brevity of the government's mention of the plea allocutions, the purely

cumulative character of the statements, and the strength of the government's case").

Most important, the proof presented at trial overwhelmingly established that Robinson

knew that he was shooting at police officers. For instance, the prosecution presented

circumstantial evidence from the security guard that Robinson was well aware that the police

were coming to his apartment. Then, police officers testified that they spent about forty-five

minutes outside the apartment, rapping on the door with their nightsticks and repeatedly calling

to Robinson that they were the police and that they wanted him to come out. Robinson began

shooting at the police officers before they could react, and he shot at them eight times; he only

stopped shooting when he ran out of ammunition. It bears noting that Robinson's weapon was a

9-mm pistol with a very heavy trigger-pull (11 ½ pounds compared to the 4 ½-pound trigger-pull

on the police officers' guns), and it was not an automatic. Officer DiFante was struck in the

chest; he would have been killed but for the fact he was wearing a bullet-proof vest. Given the

overwhelming evidence against him on those charges, Robinson cannot demonstrate that the

admission of the hearsay testimony that he had beaten his wife and locked her out of their

apartment earlier that night "had a substantial and injurious effect or influence in determining the

jury's verdict." *Brecht*, 507 U.S. at 637. Indeed, this Court is convinced "beyond reasonable

doubt that the error complained of did not contribute to the verdict obtained," *Chapman v.*

*California*, 386 U.S. at 24 (setting forth the more stringent harmless error standard applicable on direct appellate review). The Court has no difficulty in concluding that the evidence was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *United States v. Lombardozzi*, 2007 WL 1989255, at *11 (quoting *United States v. Quiroz*, 13 F.3d 505, 513 (2d Cir. 1993) (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991) (quotation marks omitted)). Because any Confrontation Clause error did not "result[ ] in 'actual prejudice,'" *Brecht*, 507 U.S. at 637, on the facts present here, the Court finds no basis for overturning Robinson's conviction.

## VI.   Conclusion

For the foregoing reasons, petitioner Paul Robinson's petition for a writ of habeas corpus is denied. Because the Court finds that Robinson has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:  August 20, 2007
        Buffalo, New York.